IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA

| | | |
|---|---|---|
| COURTNEY LEMOINE, on behalf of herself and all others similarly situated, | § § § § | Civil Action No. _____ |
| Plaintiffs, | § § | |
| v. | § § | Jury Trial Demanded |
| ESPN PRODUCTIONS, INC., and BROADLEAF RESULTS, INC., | § § § § | |
| Defendants. | § § | |

## ORIGINAL COMPLAINT

Plaintiff Courtney Lemoine ("Ms. Lemoine"), on behalf of herself and all others similarly situated, brings this action against ESPN Productions, Inc. ("ESPN"), and Broadleaf Results, Inc. ("Broadleaf")[1] and respectfully alleges as follows:

## INTRODUCTION

1. Ms. Lemoine brings this lawsuit pursuant to the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ("FLSA") for unpaid overtime wages, liquidated damages, and attorney's fees and costs.

2. Ms. Lemoine also brings this action pursuant to the Florida Whistleblower Statute, Fla. Stat. §448.102.

3. Ms. Lemoine is a citizen of St. Charles Parish, Louisiana, and has performed work for all Defendants within the meaning of the FLSA, including at the WNBA "bubble" in Bradenton, Florida, and at various other sporting events in Texas, Arkansas, Mississippi, and Alabama.

---

[1] ESPN and Broadleaf sometimes are collectively referred to as "Defendants."

1

4. ESPN is a corporation organized under the laws of Delaware and can be served through its registered agent for service of process: **Corporation Service Company, 1201 Hays Street, Tallahassee, Florida, 32301.** ESPN is an "employer" within the meaning of the FLSA and the Florida Whistleblower Statute.

5. Broadleaf[2] is a corporation organized under the laws of New York and can be served through its registered agent for service of process: **Corporation Service Company, 1201 Hays Street, Tallahassee, Florida, 32301.** Broadleaf is an "employer" within the meaning of the FLSA and the Florida Whistleblower Statute.

## JURISDICTION AND VENUE

6. This Court has original jurisdiction pursuant to 29 U.S.C. § 216(b) and 28 U.S.C. § 1331 because this action involves a federal question under the FLSA. Further, this Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

7. Venue is proper pursuant to 28 U.S.C. § 1391, as a substantial part of the acts or omissions giving rise to the claims alleged herein occurred within this judicial district, and Defendants are subject to personal jurisdiction in this district.

## FACTUAL ALLEGATIONS

8. At all times material hereto, Defendants were "enterprise[s] engaged in commerce" within the meaning of the FLSA and had more than $500,000 in annual gross revenues.

9. Defendants provide, among other things, production and broadcasting services across the United States, and their employees and so-called "contractors" routinely travel across state lines to transact business. Furthermore, Defendants' employees and so-called contractors handle and work with (a) electronic equipment, such as video cameras and microphones, and (b)

---

[2] Broadleaf previously did business under the names "Superior Workforce Solutions, Inc." For purposes of this litigation, there is no material difference between Broadleaf and Superior Workforce Solutions.

construction/production equipment, including forklifts, and cleaning supplies that have traveled across state lines.

10. Additionally, Defendants' employees and so-called "contractors" participate in meetings and engage in communications "which require[] the use of telephone and internet services from out-of-state providers." *Gonzalez v. Rockwater Dev.,* No. 6:20-cv-270-Orl-41EJK, 2021 U.S. Dist. LEXIS 21715, at *11 (M.D. Fla. Feb. 3, 2021).

11. Defendants paid Ms. Lemoine a "day rate" of $650.00 and she was **not** paid overtime when she worked hours over forty in a workweek. This day-rate compensation system is a *per se* violation[3] of the FLSA because it directly violates the statute's implementing regulations, namely 29 C.F.R. § 778.112. The regulation at issue is entitled "Day rates and job rates" and provides that:

> If the employee is paid a flat sum for a day's work or for doing a particular job, without regard to the number of hours worked in the day or at the job, and if he receives no other form of compensation for services, his regular rate is determined by totaling all the sums received at such day rates or job rates in the workweek and dividing by the total hours actually worked. ***He is then entitled to extra half-time pay at this rate for all hours worked in excess of 40 in the workweek.***

12. Regardless of how many hours worked in a given workday, Defendants instructed Ms. Lemoine and other day-rate workers to input eight (8) hours into a timekeeping program called IQ/Navigator that apparently is operated by ESPN.[4] However, Ms. Lemoine and other day-rate personnel routinely worked longer than 8 hours in a day, often working 13-15 hours per day depending on the assignment.

---

[3] *See, e.g., Thrower v. UniversalPegasus, Int'l Inc.*, No. 3:19-cv-00068, 2020 U.S. Dist. LEXIS 161132, at *20 (S.D. Tex. Sep. 3, 2020) (holding that the plaintiffs' "day-rate allegation amounted to a *per se* FLSA violation that did not depend on the job title or responsibilities of each particular plaintiff.").

[4] Based on information provided by Broadleaf, ESPN maintains and controls the IQ navigator timekeeping program. (Exhibit A, Broadleaf Position Statement at Footnote 2). Furthermore, the individuals who approved Ms. Lemoine's timecards and expense reports were employed by ESPN. (*Id.*).

13. By instructing Ms. Lemoine to record eight (8) hours no matter how many hours she worked, Defendants have failed to keep and maintain accurate records of all hours worked for day-rate workers and thereby have violated the record-keeping requirements of the FLSA. *See, e.g.,* 29 C.F.R. § 516.2(a)(1),(2) & (4) (requiring employers to maintain, *inter alia*, a record of each employee's occupation, regular hourly rate of pay, hours worked each workday, and total hours worked each workweek);

14. As evidenced by the records obtained from the IQ/Navigator timekeeping program, and by way of example, Ms. Lemoine worked (a) six days during the July 19, 2020 – July 25, 2020 workweek, (b) five days during the July 26, 2020 – August 1, 2020 workweek, and (c) seven days during the August 23, 2020 – August 29, 2020 workweek. (Exhibit B, Timecards). She worked more than forty hours in all three of these workweeks, but was paid no overtime premium and instead received only her flat day rate.

15. At all times material to this case, Defendants were aware that individuals being paid a day rate were entitled to be compensated for all overtime hours they worked in excess of forty per week. Defendants, however, nonetheless failed to pay overtime as required by the FLSA.

16. Defendants' denial of overtime compensation is, and has been, willful and deliberate.

17. In addition to violating the FLSA, Defendants also have violated the Florida Whistleblowers' Act, Fla. Stat. § 448.102.

18. While Ms. Lemoine was working as a safety worker at the WNBA "bubble," she reported her concerns regarding unsafe working conditions given the lack of appropriate safeguards to address the COVID-19 pandemic, including that Defendants: (a) were not taking the

temperature of people entering the facilities, (b) were not complying with, or enforcing, their own mask policy, and (c) were not providing workers with sufficient protective equipment.

19. In addition, Ms. Lemoine also reported her concerns that during the time that the WNBA playoffs were taking place "in the bubble," the hotel that Defendants required she and other workers to stay in (which was "on campus," but outside "the bubble") was not complying with its own COVID-19 safety policies, which endangered Ms. Lemoine and her co-workers.

20. Ms. Lemoine also objected to the aforementioned practices and refused to participate in them.

21. The practices to which Ms. Lemoine objected violate the PPE Standards mandated by the Occupational and Safety Health Administration's (OSHA's), which require the use of gloves, eye, face, and respiratory protection when job hazards warrant them.

22. These unlawful practices also violate OSHA's General Duty Clause, which requires employers to provide their employees with a safe workplace free of recognizable hazards. This includes having providing PPE to at-risk workers and not subjecting employees to hazardous or unsafe conditions. *See* 29 U.S.C. §654(5)(a)(1).

23. Ms. Lemoine's objections to the foregoing and unsafe work practices in violation of OSHA regulations constitute protected activity pursuant to Section 448.102(3), Florida Statutes.

24. After Ms. Lemoine reported her concerns about the working conditions related to the COVID-19 epidemic and objected to the same, Defendants discharged her, ostensibly because she had gone to Starbucks get coffee with a co-worker. At all times relevant hereto, Ms. Lemoine and her co-worker were wearing masks and complying with all COVID-19 policies implemented by Defendants.

5

25. Notably, Defendants had no policy prohibiting workers from going to Starbucks with their co-workers (provided they wore a mask) at the time Ms. Lemoine was terminated.

26. Moreover, Diane Dovjak, an Operations Producer at ESPN who was listed as one of two "Key On-Site Operations Contacts" during the time Ms. Lemoine was working in and around the WNBA "bubble," was well aware that Ms. Lemoine and others would go to Starbucks to get coffee. In fact, on August 22, 2020 – just a few weeks before Ms. Lemoine's abrupt discharge – Ms. Dovjak specifically asked Ms. Lemoine to get her a "grande latte hot" from Starbucks, and Ms. Lemoine obliged.  (Exhibit C, Text Messages between Ms. Lemoine and Ms. Dovjak).

27. Ms. Dovjak was the primary individual responsible for Ms. Lemoine's discharge because she is the individual who reported that Ms. Lemoine somehow had done something wrong for going to Starbucks when Ms. Dovjak had previously condoned this exact same practice.  Thus, there is no question that Defendants' stated reason for discharging Ms. Lemoine was pretextual and not the true reason for her termination.

28. As a result of Ms. Lemoine's reports regarding the aforementioned unlawful conduct, and her objections and refusal to participate in the same, Defendants terminated her employment.

29. Under Florida law, terminating an employee for objecting to a violation of law, rule, or regulation, or the employee's reasonable belief that said conduct violates same, is a violation of the Florida Whistleblower Statute. *See Aery v. Wallace Lincoln–Mercury, LLC,* 118 So.3d 904, 916 (Fla. 4th DCA 2013) (To establish a violation of the Florida Whistleblower Statute, an employee must establish that: (1) she objected to or refused to participate in an illegal activity, policy, or practice, or what she reasonably believed to be illegal; (2) she suffered an adverse

employment action; and (3) the adverse employment action was causally linked to her objection or refusal). All of the above elements are met here.

### JOINT EMPLOYER ALLEGATIONS FOR FLSA CLAIMS

30. The FLSA broadly defines an " employer" to include "any person acting directly or indirectly in the interest of an employer in relation to an employee…" 29 U.S.C. § 203(d). The FLSA specifically "contemplates that there may be several simultaneous employers who are responsible for compliance with the FLSA." *Ceant v. Aventura Limousine & Transp. Serv.*, 874 F. Supp. 2d 1373, 1380 (S.D. Fla. 2012) (internal quotations and citations omitted).

31. To determine whether an entity is a joint employer for purposes of the FLSA, courts in the Eleventh Circuit look to the following factors:

> (1) the nature and degree or control of the workers; (2) the degree of supervision, direct or indirect, of the work; (3) the power to determine the pay rates or the methods of payment of the workers; (4) the right, directly or indirectly, to hire, fire, or modify the employment conditions of the workers; (5) preparation of payroll and the payment of wages; (6) ownership of facilities where work occurred; (7) performance of a specialty job integral to the business; and (8) investment in equipment and facilities.

*Freeman v. Key Largo Volunteer Fire & Rescue Dep't.,* Inc., 494 F. App'x 940, 943 (11th Cir. 2012). No one factor is dispositive, and the existence of a joint-employer relationship depends on the totality of the circumstances. *Id.*

32. Broadleaf holds itself out as "a business process outsourcing and workforce solutions company, and claims to "deliver[] total talent management solutions to a wide range of industries, providing various business process outsourcing services," including "employer of record/payrolling services (EOR)." (Exhibit A, Broadleaf Position Statement at p. 1).

33. As part of its employer of record/payrolling services, Broadleaf claims to "employ[] individuals (*i.e.,* 'payrolls' the employees) who then perform work for Broadleaf's customers," such as ESPN. (*Id.*).

34. However, according to Broadleaf, (a) "[t]he only part of Ms. Lemoine's employment in which Broadleaf ha[d] involvement [wa]s with respect to onboarding her and paying her in accordance with her contract of employment, after she inputs the days on which she works within ESPN's system, IQ Navigator." (*Id.* at p. 2).

35. Moreover, Broadleaf has expressly asserted that "Ms. Lemoine's daily activities were at all times supervised by ESPN employees, who scheduled, directed, and oversaw the work performed by Ms. Lemoine." (*Id.*).

36. Based on Ms. Lemoine's experiences, Broadleaf's characterization is largely correct regarding ESPN's involvement with her employment. In addition to Broadleaf's assertions, the following demonstrate that ESPN is an employer under the FLSA:

   (a) an ESPN employee, Director of Health & Safety Mr. Robert Bee, hired her,

   (b) ESPN (in addition to the WNBA) supervised, monitored, and directed her work, and,

   (c) she was informed of her discharge from the WNBA "bubble" by ESPN employees, including Ms. Dovjak and Operations Jarrett Baker, who were directly involved with the decision to terminate Ms. Lemoine.

37. Thus, while Broadleaf issued Ms. Lemoine her paychecks and was her "employer of record" for payroll and tax withholding purposes, ESPN directed the means, mode, and conditions of her work.

## COLLECTIVE ACTION ALLEGATIONS FOR FLSA CLAIMS

38.     The Broadleaf contract is a standardized "day-rate" contract. It specifically provides for the payment of a "day rate" and has "fill-in-the-blank" spaces for the Job Title and Pay Rate to be inserted.  More specifically,

   (a) Paragraph three of the contract refers to pay rate of a specified amount that is to be paid "per day" and states that "[t]his day rate represents your total straight time compensation for each day that you work, no matter how many hours that you work that day."

> **3. Compensation**
> The pay rate for this assignment is  $650.00  per day.  This day rate represents your total straight time compensation for each day that you work, no matter how many hours that you work that day.  You are not authorized to work overtime as defined by the work state.  If overtime is worked, you will be paid in accordance with the applicable law.  Although you may receive your pay earlier, the Friday following the end of the prior work week is the official payday.

   (b) The introductory paragraph has the job title "Security Worker" inserted in that "fill-in-the-blank" provision:

> Employee agrees to be employed by Superior Workforce Solutions, Inc. (hereinafter "SWS") and to be assigned at ESPN (hereinafter "Customer") as a Security Worker commencing on such date as to be advised by SWS.  This employment is limited to this assignment, and will terminate when this assignment ends unless SWS and Employee specifically agree otherwise in the future.

(Exhibit D, Contract at p. 1 (Introductory Paragraph) and ¶ 3).  Notably, Ms. Lemoine was not a "Security Worker," but rather a Safety Officer.  Nonetheless, Broadleaf still had Ms. Lemoine execute this standardized day-rate contract, further evidencing that the legality of a day-rate compensation scheme does not depend on the worker's job title or position.

39.     As evidenced by the standardized "day-rate" contract with fill-in-the-blank provisions, Broadleaf uses this "day-rate" contract, or a similar iterations, to contract with workers on its payroll not only for ESPN, but also for other clients.

40.     Plaintiffs seek to certify the following three classes/subclassed for purposes of their FLSA claims for the three-year period prior the filing of this Complaint:

9

(a) All workers, contractors, and vendors who were paid a day rate and worked more than forty hours in a workweek while working in or around the WNBA "bubble,"

(b) All workers, contractors, and vendors who were on Broadleaf's payroll who were paid a day rate and worked more than forty hours in a workweek, whether for Broadleaf or for one or more of its clients; and

(c) All workers, contractors, and vendors who performed any services for ESPN who were paid a day rate and worked more than forty hours in a workweek.

41. In a day-rate case such as this one, the job duties and job titles of each individual are irrelevant because they were paid "a fixed amount per day, irrespective of whether they performed work in excess of 40 hours in a given workweek" and therefore "the compensation scheme is, in and of itself, a violation of the FLSA." *Thrower v. UniversalPegasus, Int'l Inc.,* No. 3:19-cv-00068, 2020 U.S. Dist. LEXIS 161132, at *20-21 (S.D. Tex. Sep. 3, 2020). This means that "no further factual inquiry into the job duties of each potential class member is required, as "liability can be determined collectively without limiting the class to a specific job position." *Id.*[5]

**FIRST CAUSE OF ACTION**
(Violations of the FLSA's Overtime Provisions)

42. Ms. Lemoine incorporates by reference each and every allegation set forth in the preceding paragraphs as though fully set forth.

43. The FLSA requires employers to pay overtime to non-exempt employees for all hours worked over forty (40) in a workweek.

---

[5] Indeed, courts across the country routinely grant conditional certification to groups of workers who were paid on a day rate basis, regardless of job duty or geographical location. *See, e.g., Tamez v. BHP Billiton Petroleum (Americas), Inc.,* No. 5:15–cv–330–RP, 2015 WL 7075971, at *7 (W.D. Tex. Oct. 5, 2015); *see also Fenley v. Wood Grp. Mustang, Inc.,* No. 2:15-cv-326, 2016 WL 1059681, at *5 (S.D. Ohio Mar. 17, 2016); *Casarotto v. Expl. Drilling, Inc.,* No. 15-cv-41, 2015 WL 6080755, at *4 (D. Mont. Oct. 15, 2015).

44. Defendants have committed *per se* violations of the FLSA.by paying Ms. Lemoine and other similarly-situated individuals a flat "day rate" without paying overtime for hours over forty in a workweek.

45. Defendants' conduct, as alleged, constitutes a willful violation of the FLSA.

46. As a result of Defendants' unlawful conduct, Ms. Lemoine and similarly-situated workers are entitled to damages equal to the amount of all uncompensated time, including minimum wage and overtime pay, and an award of liquidated damages in an amount equal to the amount of unpaid compensation owed under the FLSA.

47. Plaintiffs also seek reasonable attorney's fees and costs, as provided by the FLSA.

**SECOND CAUSE OF ACTION**
(Unlawful Retaliation in Violation of Fla. Stat. §448.102)

48. Ms. Lemoine incorporates by reference each and every allegation set forth in the preceding paragraphs as though fully set forth.

49. Defendants illegally terminated Ms. Lemoine from her employment in violation of Section 448.102 (3), Florida Statutes.

50. Ms. Lemoine's employment was terminated for no reason other than her reporting, and objecting to, illegal activity, or what she reasonably believed to be illegal activity in violation of Section 448.102(3),

51. Ms. Lemoine objected to a violation of a law, or what she reasonably believed to be a violation of law, and was terminated as a direct result of same, which constitutes a violation of the FWA.

52. As a result of Defendant's intentional, willful, and unlawful actions, Ms. Lemoine has suffered damages, including but not limited to lost wages, lost benefits, lost employment status,

as well as humiliation, pain and suffering, attorney's fees, costs, and other monetary and non-monetary losses.

## DEMAND FOR JURY

53.     Plaintiffs hereby demand a trial by jury for all issues in this case.

## PRAYER FOR RELIEF

WHEREFORE, having set forth their Complaint, Ms. Lemoine and similarly-situated individuals respectfully request that this Court:

(a) Enter a declaratory judgment that the practices complained of herein are unlawful under the FLSA and that Defendants willfully violated the rights of Plaintiffs under the FLSA;

(b) Award unpaid back wages and liquidated damages equal in amount to the unpaid compensation found due to them under the FLSA;

(c) Award Ms. Lemoine lost wages, lost benefits, lost employment status, as well as humiliation, pain and suffering and other monetary and non-monetary losses for Defendants' violations of the Florida Whistleblower Statute;

(d) Award attorney's fees, pre-judgment and post-judgment interest, and costs (including expert witness expenses), all as provided by law; and

(e) Award other legal and equitable relief that this Court deems just and proper.

Dated: February 16, 2021                    Respectfully Submitted:

**WILLIAMS LITIGATION, L.L.C.**

By:  S/ Christopher L. Williams
Christopher L. Williams
La. Bar Roll No. 32269
639 Loyola Ave., Suite 1850
New Orleans, LA 70113
Telephone: 504.308.1438
Fax: 504.308.1446
chris@williamslitigation.com

***Attorney for Plaintiffs***